**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **v.** | **Criminal Action No.  15-42 (JEB)** |
| **ALAN J. SALTZMAN, D.O.,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OPINION**

While it is not uncommon for defendants to seek trial delays based on a lack of mental competence, it is far rarer to see a legitimate claim of physical incapacity.  Yet that is what the Court now faces.

Alan Saltzman, a doctor of osteopathy (D.O.) residing in south Florida, and Titilayo Akintomide Akinyoyenu, a pharmacist and owner of a retail pharmacy in Washington, D.C., were indicted in March 2015 on four conspiracy-related counts involving an alleged scheme to unlawfully distribute prescription drugs by internet and mail.  Last July, Saltzman moved to sever and indefinitely postpone his trial on the ground of poor health.  He suffers from a number of serious ailments and argues that a lengthy trial conducted far from his home would place him at great risk.  The government does not dispute that Saltzman is unwell but believes that his medical needs may be accommodated by the Court in such a way that severance is not necessary.

Convinced by persuasive testimony that a joint trial would at present constitute an unwarranted physical ordeal, the Court will grant Saltzman's Motion to Sever, but will order a continuance only through the end of Akinyoyenu's trial.  The Court will at that point determine whether Saltzman is physically able to withstand his own separate trial.

## I.      Background

### A.  Procedural History

According to the indictment, Defendants collaborated in a scheme to unlawfully fulfill tens of thousands of prescription drug orders.  Pursuant to the alleged conspiracy, Saltzman would approve prescription-drug requests from online buyers without seeing, consulting, diagnosing, or evaluating those "patients."  In that way, the government charges, he wrote prescriptions without having established a doctor-patient relationship, which is a prerequisite for the lawful distribution of a controlled substance.  See Indictment, ¶¶ 13, 20.  With Saltzman's prescriptions in hand, Akinyoyenu as pharmacist would then fill the orders despite knowing that the prescriptions were not *bona fide*.  In this manner, the government alleges, Defendants completed upwards of 60,000 orders and took in approximately $8.4 million in proceeds.  Id., ¶¶ 20, 22, 24.

Saltzman was arraigned by videoconference in April 2015, see Minute Entry of Apr. 29, 2015, and placed on personal recognizance at his home in Florida.  See ECF No. 13 (Order Setting Conditions of Release).  In July 2015, on account of his poor health, he moved to sever his case from Akinyoyenu's and sought an indefinite continuance.  See Mot. at 1-2.  After briefing on the matter was complete, the Court held an evidentiary hearing on December 11, 2015, at which Saltzman, his wife Dorota, and his gastroenterologist and coordinator of care – Dr. David Silver – testified.  See ECF No. 47 (Transcript).

### B.  Saltzman's Medical Condition

The central consideration in evaluating Defendant's Motion is his current physical condition, which the Court will describe by drawing on his physician's affidavits, the testimony presented at the December 2015 hearing, and the Court's observations of Saltzman at that time.

Fortunately, the parties seem to agree on the medical evidence, with a dispute emerging only as to what legal conclusion may be drawn therefrom.

Saltzman is 65 years old.  See Mot., Exh. A (Affidavit of David Silver, M.D.), ¶ 9.  He suffers from numerous interrelated ailments affecting his digestive, endocrine, circulatory, muscular, nervous, skeletal, and immune systems, all of which place substantial limits on his physical activity and require routinized treatment.

      1.  *Digestive Problems*

Digestive issues loom large for Saltzman.  In his late 20s, he was diagnosed with Crohn's, a disease that causes inflammation of the small intestine and has the potential to affect the whole digestive tract.  See Test. of Dr. David Silver, Tr. at 20:18-21:2.  He first attempted to manage his Crohn's medicinally, but he ultimately underwent numerous abdominal surgeries to remove "a significant portion of his small intestines."  Silver Aff., ¶ 12.  He now suffers what is known as Short Bowel Syndrome, which means he lacks the intestinal length needed to "absorb the amount of nutrients" and retain "fluid levels" sufficient for survival.  Id., ¶ 13.  In 2010, he was also diagnosed with colon cancer, which required surgical removal of portions of his large intestine.  Id., ¶ 22.  This further reduced his body's ability to absorb fluids.  See Silver Test., Tr. at 21:12-17.

Shortly before his colon-cancer diagnosis, Saltzman lost his ability to meet all of his nutritional needs by consuming solid foods.  See Silver Aff., ¶ 14.  He thus began receiving intravenous infusions of liquid containing all of the necessary nutritional requirements for his survival – *e.g.*, lipids, proteins, carbohydrates, and vitamins, as well as some medications.  Id., ¶ 15.  This liquid infusion is called "Total Parenteral Nutrition" (TPN).  Id.  Following treatment of his colon cancer, he was forced to receive 100% of his nutrition through TPN.  Id., ¶ 23.  This

necessitates a daily infusion; he "plug[s] in" to an IV system that dispenses the nutrient-rich fluid over an 11- to 12-hour period.  See Silver Aff., ¶¶ 15-16; Testimony of Alan Saltzman, Tr. at 114:7-12.  He receives the infusions overnight, usually beginning around 6:30 p.m. and ending when he wakes sometime between 5:30 and 6:00 a.m.  See A. Saltzman Test., Tr. at 114:7-15.

The quantity of fluids he receives overnight results in "fluid overload," which, given his failed kidneys (more on that below), means that those fluids are slow to leave the body.  See Supplemental Affidavit of Dr. David Silver, at ¶ 6; Silver Aff., ¶ 27.  During fluid overload, his heart is forced "to work harder to try and push oxygen and nutrients through" his body, see Silver Aff., ¶ 27, which makes it difficult for him to breathe.  See Silver Test., Tr. at 42:3-7.  Upon waking every morning, he typically takes a diuretic to help him evacuate the fluids, rests for a few more hours, and then is finally ambulatory sometime around 9:00 a.m.  See A. Saltzman Test., Tr. at 115:8-116:5.

2. *Infections*

His need to receive IV nutrition also created parallel, infection-related problems.  The IV's entry points into his body are "permanent openings," and, as a result, they are "prone to receiving bacteria from human contact."  Silver Aff., ¶ 18.  Saltzman has already suffered bacterial infections and/or blood clots in both arms related to the presence of IVs, and neither arm is now able to be used as a site for TPN infusions.  See id., ¶¶ 19, 34.  Once he lost the ability to use his arms as IV entry points, he briefly received his TPN through his jugular vein – a location that can only be used temporarily – and now has a port installed in his chest.  See id., ¶¶ 34-35.  According to his gastroenterologist, the chest port is "the last and worst location for a Port"; last, because he has no other permanent options available on his body for receiving IV

infusions, and worst, because "an infection in [his] chest can be rapidly fatal." Id., ¶ 35; see Silver Test., Tr. at 28:6-16.

>        3. *Blood Transfusions*

Saltzman's digestive issues have also had a negative impact on his renal functions and capacity to produce blood, leading to chronic renal insufficiency, kidney failure, and anemia. Silver Aff., ¶ 26; Silver Supp. Aff., ¶  4.  These issues have rendered him unable to produce erythropoietin, a hormone that the body needs to make blood cells and platelets.  See Silver Supp. Aff., ¶ 4 & Appendix A (Medication List) (describing administration of Procrit); Silver Test., Tr. at 30:3-31:3.  Since he cannot produce his own blood, Saltzman must receive blood transfusions for replenishment.  See Silver Test., Tr. at 32:12-23.  His blood is sampled weekly to test his hemoglobin level, which measures his red-blood-cell concentrations.  See id. at 31:15-32:23; Testimony of Dorota Saltzman, Tr. at 84:7.  If his levels are abnormally low – a state that carries risk of heart attacks and strokes – he receives a transfusion.  See Silver Test., Tr. at 33:19-25.

Like the nightly infusions of TPN, blood transfusions require large volumes of fluid to enter his body, which musts occur slowly.  See id. at 34:18-23, 35:14-15.  They typically take four to six hours, and, because the transfusions cause temporary respiratory stress, an additional period of recovery may be necessary before his breathing returns to normal.  Id. at 35:1-17, 58:10.  He has been receiving blood transfusions on average once per month, although that frequency appears to have increased more recently.  See id. at 32:12-23, 48:10-14, 58:4-6.

>        4. *Orthopedic Issues*

Saltzman's Crohn's disease has caused bone-related problems, which increase his risk of fracture-related hospitalization, cause pain, and decrease both his mobility and dexterity.  On

account of his taking steroids (Prednisone) to treat his Crohn's, he has developed Cushing's disease, which deteriorates and embrittles his bones, rendering them more susceptible to breakage.  See Silver Aff., ¶ 25; Silver Supp. Aff., ¶ 10.  His physician indicates that he has been hospitalized in the past for "frequent broken bones and fractures."  Silver Aff., ¶ 25.

He also has cervical stenosis, a condition that causes narrowing of the spinal canal and pinching of the spinal cord.  See Silver Test., Tr. at 28:17-29:10.  This condition, in combination with his osteoporosis, causes pain, numbness, weakness in his extremities, and may result in paralysis from the neck down.  See id. & at 48:15-23; Silver Supp. Aff., ¶ 10.  It also makes sitting upright painful, which may be ameliorated by periodic standing or stretching.  See Silver Test., Tr. at 10:24-11:6.

### 5. *Routine Medical Care*

Saltzman has assembled a team of doctors to treat this confluence of medical problems. He sees his hematologist most frequently – typically every Friday for around one hour – to draw and test his blood, which is used to prepare his nutritional infusions.  See id. at 49:20-50:7; A. Saltzman Test., Tr. at 102:20-103:10.  He sees several physicians at least monthly, including Dr. Silver, his gastroenterologist, as well as his primary-care, pain-management, and infectious-disease doctors.  See A. Saltzman Test., Tr. at 103:14-24.  He also requires sporadic – *i.e.*, once every few months – checkups from his neurosurgeon, urologist, and nephrologist.  Id. at 122:10-18.  Finally, he depends heavily on a pharmacist with the capacity to prepare his TPN, which must be formulated in response to the particular blood-test results provided by his hematologist. See Silver Test., Tr. at 49:15-50:18.

6.   *Activities and Physical Appearance*

Saltzman's mobility is relatively constrained, both because of his physical state as well as practical limits placed upon his schedule by necessary treatments and appointments.  In the 12 hours of each day when he is not connected to the TPN-infusion pump, he spends much of his time resting, napping, and attending medical appointments.  See D. Saltzman Test., Tr. at 80:10-12, 93:25-94:4; A. Saltzman Test., Tr. at 125:16-25.  He occasionally accompanies his wife when she walks their dog in a "small circle around [their] neighborhood."  D. Saltzman Test., Tr. at 82:6-10.  And at times they go to lunch at restaurants close to their house, where they stay only briefly and Saltzman eats very little, if anything.  See id., 93:7-24.  He is able to drive himself to his medical appointments.  See id., 93:25-94:4.

At the hearing Saltzman appeared alert and responsive.  It began at 11:00 a.m. and adjourned at 3:00 p.m., and it included one ten-minute break and one hour-long lunch break from 1:00 to 2:00 p.m.  See Tr. at 38:16, 96:19-20.  He testified, however, that he "fe[lt] terrible."  Id. at 116:23; see id. at 117:11-13 ("[M]y stomach is starting to hurt.  My arms are burning.  My neck hurts.  And I'm having problems catching my breath.").

## II.   **Legal Standard**

This Circuit has not addressed what standard governs the question of whether to sever or postpone a defendant's trial in a criminal case on the ground of physical incapacity.  Its civil precedent, while undoubtedly hoary, concludes that this is a matter committed to the discretion of the trial-court judge.  See Harrah v. Morgenthau, 89 F.2d 863, 864 (D.C. Cir. 1937) (reversing district court's denial of a six-month continuance for abuse of discretion where "the plaintiff was his [own and] only witness and was so seriously ill that his appearance in court would probably have resulted in his death"); Bradshaw v. Stott, 7 App. D.C. 276, 280 (D.C. Cir. 1895) ("The

postponement or continuance of a cause, in the courts of the United States . . . has . . . been generally regarded as a matter addressed peculiarly to the sound discretion of the trial court . . . .").  More recent criminal decisions in other circuits concur.  See Bernstein v. Travia, 495 F.2d 1180, 1182 (2d Cir. 1974) ("Whether a defendant's physical condition is so poor as to require a continuance or severance" in a criminal case is a decision "reserved to the sound discretion of the district Judge."); accord United States v. Zannino, 895 F.2d 1, 13 (1st Cir. 1990) (concluding that district court did not abuse discretion in denying continuance where it "took substantial steps to reduce the medical risks incident to trial," including ordering that Defendant be "tried alone and sever[ing] most of the charges against him, leaving only three. . . . [that] were handpicked to create both a shorter trial and one likely to curtail wear and tear on the defendant (emotional as well as physical)"); United States v. Brown, 821 F.2d 986, 988 (4th Cir. 1987) (no abuse of discretion in denying continuance).

## III.   Analysis

In weighing whether a severance or continuance is proper, the Court's goal is to "assess the degree to which a defendant's health might impair his participation in his defense," and to determine whether "the proceeding is likely to worsen the defendant's condition" or may result in risk to his health, and to balance that against "the public interest in bringing those accused of criminal misconduct promptly to account."  Brown, 821 F.2d at 988.  "The mere possibility of an adverse effect on [Defendant's] wellbeing is not enough to warrant a postponement."  Zannino, 895 F.2d at 13.  Rather, "'the medical repercussions must be serious and out of the ordinary; the impending trial must pose a substantial danger to a defendant's life or health.'"  Id. at 13-14 (quoting Brown, 821 F.2d at 988); see also United States v. Passman, 455 F. Supp. 794, 797

(D.D.C. 1978) ("The defendant cannot fairly be subjected to legal proceedings that would involve a substantial risk to his health or life.").

There is "no all-inclusive checklist of the factors which bear on such a determination." Zannino, 895 F.2d at 14. But when a defendant makes a "colorable claim of medical dangerousness," the Court should

> investigate the situation, assemble the pertinent data, and then consider not only the medical evidence but also the defendant's activities (in the courtroom and outside of it), the steps defendant is taking (or neglecting to take) to improve his health, and the measures which can feasibly be implemented to reduce medical risks. . . . [T]he judge must [then] weigh the foreseeable risks against the demonstrable public interest, taking into account factors such as the severity of the charges and the extent of the government's interest in trying the defendant. If the perceived risks overbalance the perceived benefits, a continuance must be granted.

Id.

The government does not contest that Saltzman is a very sick man with serious and sometimes life-threatening conditions – all of which are unlikely to improve – or that his ailments limit his ability to sit through and participate in trial as a defendant. Nor does it dispute that Saltzman is actively managing his health and doing all he can to improve his physical condition.

The Court, too, finds this portrait to be accurate. The written testimony presented by Silver, along with his and both Saltzmans' trial testimony, offered credible evidence that Defendant's health concerns are serious and debilitating. The $64 question is what conclusion to draw from those facts. After briefly laying out the basic assumptions connected with the anticipated trial, the Court explains why a severance is warranted.

It is helpful to begin by assessing the projected conditions under which Saltzman would be tried were the Court to reject his plea for severance. In his Motion, he states that the

"Government . . . informed [Saltzman's] counsel that [it] expects to call 20 witnesses during [its]

case-in-chief that would last at least three weeks."  Mot. at 14-15.  The government does not

dispute that representation, but estimates – perhaps optimistically – that the <u>whole</u> trial is

"estimated to last two to three weeks."  Opp. at 13.  The Court will assume for purposes of the

motion that the trial would, under normal conditions, last at least three weeks, and that it would

likely extend to five or six if the Court accommodated Saltzman's reduced daily mobility and

need for regular appointments by shortening both the hours per day (from seven hours, excluding

lunch, to five) and days per week (from five days to four).  <u>See, e.g.</u>, Tr. at 49:5-51:6 (Court's

questions to Dr. Silver regarding possible trial-schedule modifications); Opp. at 13 (proposing

trial schedule with "shorter court days and weeks [and] frequent recesses").

    While providing these accommodations would likely make the trial conditions more

tolerable on a daily basis, it would increase the amount of time that Saltzman would be away

from his Florida home, meaning that he would spend a longer duration separated from his long-

time medical team.  Also, given Saltzman's history of relatively frequent hospitalizations in

2015, <u>see</u> Silver Aff., ¶¶ 29-36; Silver Supp. Aff., ¶ 8; A. Saltzman Test., Tr. at 120:11-12, and

the fact that his condition has not improved, the longer the trial extends, the more likely he is to

suffer a condition requiring a period of hospitalization.  <u>See</u> Silver Test., Tr. at 51:1-5 ("[I]f

you're going to put him here for six weeks, I would say there's a good chance he would end up

in the hospital sometime during that period because it's hard to keep him out of the hospital.").

And the longer the trial, the more recesses would be necessary for blood transfusions or other

medical visits.  Finally, all of this does not take into consideration the effect of any stress that

Saltzman might undergo as a result of trial upon his other medical troubles.  <u>See</u> <u>id.</u> at 42:8-

43:15.

In addition, although courts typically benefit from a denial of severance – since one trial is almost always more efficient than two – that would likely not be the case here.  Indeed, the Court would be beholden to the vicissitudes of Saltzman's condition from day to day and hour to hour, and would likely be required to preside over considerably lengthened proceedings. Codefendant Akinyoyenu, moreover, would also suffer from the increased time and expense of a long trial.  The more the government attempts to accommodate Saltzman's health by adjusting the trial schedule – *e.g.*, more days off, shorter trial days – the more burdensome the result to Akinyoyenu.  But this conflict can be eliminated altogether if the two are tried separately.  <u>See</u> <u>United States v. Gunter</u>, No. 12-394-4, 2013 WL 5942341, at *2 (E.D. Pa. Nov. 5, 2013) (granting defendant's motion to sever trial from his codefendants and temporarily continue where court concluded that "a significant extension of the trial schedule would unfairly increase the expense for the other two defendants"); <u>see also</u> <u>United States v. Jones</u>, 876 F. Supp. 395, 397 (N.D.N.Y. 1995) (identifying "usefulness of delay" as a relevant factor).

Severance offers the additional benefit of streamlining the evidence and reducing the total trial time for Saltzman as a single defendant if and when he is ultimately tried.  At such a trial, the government would have no need to present evidence relevant to Akinyoyenu's charges but immaterial to Saltzman's.  In addition, Saltzman could move to transfer the case to the Southern District of Florida – should he believe such transfer to be warranted, <u>see</u> <u>Platt v. Minnesota Min. & Mfg. Co.</u>, 376 U.S. 240, 241 (1964) – without having to justify the added burden that such an action would impose on a codefendant who lives in the Washington, D.C., area.

By severing the trials and delaying Saltzman's until the conclusion of Akinyoyenu's, the Court and the parties would also benefit from additional information regarding Saltzman's physical condition.  It may be that his health is relatively stable or he may suffer a decline in the

coming months.  In addition, the Court will be able to more precisely estimate the length of

Saltzman's prospective trial while using Akinyoyenu's as a guide.  It may then determine

whether further postponement is warranted or whether trial should proceed.

The Court recognizes that a severance and temporary postponement also comes with a

cost.  It places added stress on witnesses who may be called to testify in both trials, it burdens

government resources by forcing it to manage two trials, and it may provide Saltzman with a

slight advantage insofar as he may benefit from "knowledge of the contents and weaknesses of a

witness's testimony" provided in Akinyoyenu's trial.  See United States v. Gambino, 729 F.

Supp. 954, 970-71 (S.D.N.Y. 1990).  In addition, it taxes the public's interest in "speedy

disposition" of criminal cases, see Bernstein, 495 F.2d at 1182, since Saltzman's trial will be

delayed for additional months.

At the same time, these burdens do not appear to outweigh the benefits of severance,

particularly since the Court is not at this point concluding that an indefinite continuance is

warranted or that Saltzman can never stand trial.  The government, furthermore, has not argued

that any delay is intolerable, and thus the Court concludes that there is little to no "injury to the

public interest" that would "result from delay."  United States v. Doran, 328 F. Supp. 1261, 1263

(S.D.N.Y. 1971).  This is true, in part, because Saltzman's crimes are significantly less

substantial than those in other cases in which a severance and continuance were denied in part

due to the seriousness of the offense.  See Zannino, 895 F.2d at 3 (senior figure in "La Cosa

Nostra" indicted on racketeering predicated on two counts of murder and four counts of

conspiracy to commit murder); United States v. Al Fawwaz, 67 F. Supp. 3d 581, 588 (S.D.N.Y.

2014) (seriousness of offense weighed heavily in denial of motion to sever where defendant

charged with "conspiracy to kill Americans abroad, resulting in the August 1998 bombings of

two United States embassies"); United States v. Gigante, 987 F. Supp. 143, 151 (E.D.N.Y. 1996)

(public "interest in a speedy disposition is plain" where defendant charged with "six murders,

conspiracy to commit three other murders, and various crimes of labor payoffs, extortion, and

mail fraud"); United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992) ("[T]he

public clearly has an interest in avoiding any delay or total preclusion of John Gambino's trial"

where he was charged "with being a 'captain' in a large-scale organized crime association known

as the Gambino Crime Family" and that he "committed various acts of racketeering including

distribution of narcotics, murder, extortion, loansharking, and illegal gambling."); United States

v. Carollo, No. 94-158, 1995 WL 143539, at *3 (E.D. La. Mar. 30, 1995) ("When the allegations

include ties to organized crime, other courts have found that it would be inappropriate to sever

and indefinitely postpone a defendant's trial."); cf. Gunter, 2013 WL 5942341, at *2 (E.D. Pa.

Nov. 5, 2013) ("While . . . fraud charges . . . are serious, there are crimes of greater magnitude in

the lexicon of federal offenses.").

Even if the Court were to view this crime as similar to those mentioned above, such a fact

would weigh far more heavily in a decision to indefinitely postpone – resulting in a "total

preclusion of a trial," see Doran, 328 F. Supp. at 1263  – than it does in assessing the effect of a

limited delay.  The government does not dispute, furthermore, that Saltzman poses no risk of

repeating the crimes charged in his indictment.  It agrees that he is no longer a licensed

osteopath, see Opp. at 2 n.1, which is a necessary predicate for serving as a prescribing physician

in online-pharmacy operations.  The likelihood of recidivism is therefore null.  See United States

v. Pollock, No. 11-71, 2014 WL 5782778, at *16 (M.D. Fla. Nov. 6, 2014) (indicating a

preference for speedy trial of defendant charged with distributing child pornography where "the

potential for any recidivism is high regardless of how ill Defendant may be: all Defendant needs

is a computer and the internet to commit the crimes that he is alleged to have committed").

Severance and a temporary continuance creates no additional risk to the public welfare, and it

will not impinge on "the Government's right to present its charges and to fulfill its public duty."

United States v. DePalma, 466 F. Supp. 920, 926 (S.D.N.Y. 1979).

     On balance, therefore, the Court concludes that Saltzman's health and the benefits

associated with severing the trial outweigh the drawbacks of doing so.

## IV.    Conclusion

     For these reasons, Saltzman's Motion to Sever will be granted.  The Court will permit a

continuance lasting through the end of Akinyoyenu's trial.  At that point, the Court will revisit

the issue and, depending on the medical evidence, set a trial date.

 

/s/ <em>James E. Boasberg</em>
JAMES E. BOASBERG
United States District Judge

Date:  January 22, 2016