UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TITILAYO AKINTOMIDE AKINYOYENU,<br><br>Defendant. | Criminal Action No. 15-42 (JEB) |

### MEMORANDUM OPINION

Defendant Titilayo Akinyoyenu is a local pharmacist who also ran an online pharmacy. To obtain a prescription drug from him over the internet, customers would place an order and fill out a medical questionnaire. Defendant then paid doctors – including Co-Defendant Alan Saltzman – to review these questionnaires and issue prescriptions for the ordered drugs, thereby green-lighting the online pharmaceutical dealings. In 2015, a grand jury returned an Indictment charging Akinyoyenu and Saltzman with conspiracy to distribute controlled substances without valid prescriptions and to commit mail fraud by deceiving customers in the process.

Akinyoyenu now asks the Court to dismiss the Indictment without prejudice on the basis that the grand jury did not hear the whole truth and, sometimes, even heard false testimony. As the Court does not see how the misstatements by the Government – if they are misstatements at all – substantially swayed the grand jury, it will deny Defendant's Motion.

**I.      Background**

The parties agree on the basic facts. Akinyoyenu sold drugs, many of which required prescriptions, from his internet pharmacy between 2005 and 2010. See Mot. at 2; Opp. at 3. Part of his sales model was to have customers fill out medical questionnaires requesting prescriptions when they ordered drugs; Defendant would then forward those questionnaires to physicians –

1

one of whom was Saltzman – who would prescribe or refuse to prescribe the sought drugs.  See Mot. at 2; Opp. at 3.  If approved, the drugs shipped.  See Mot. at 2; Opp. at 3-7.

Beyond this, the facts get murkier.  For now, the Court focuses on what the Government told the grand jury.  Although the parties did not submit all the relevant transcripts of grand-jury testimony, the Court relies on their briefs as there is no dispute over the words said.  See Mot. at 4-5, 8-9 (quoting May 15, 2014, Grand Jury Transcript); Reply at 3-4 (quoting same).

First, the grand jury learned that Saltzman approved many prescriptions and denied others, but the facts are not clear about the total volume of orders.  An FBI agent testified that Defendant's website received 38,363 prescription-drug orders.  See May 15, 2014, GJ Tr. at 47.  An email from the website host to the FBI, conversely, counts 57,804 prescriptions approved by Saltzman.  See ECF 65-2 (GJ Exh. 48); see also ECF No. 66 (June 5, 2014, GJ Tr.) at 10 (same).  The Court need not now resolve this discrepancy.  With regard to how many prescriptions Saltzman rejected, the grand jury heard the following:

| | |
|---|---|
| JUROR: | Were any – not just with Dr. Saltzman, but in the course of the investigation, were any people's prescription requests ever denied? |
| WITNESS: | Yes. |
| JUROR: | There were some denied? |
| WITNESS: | Yes. |
| PROSECUTOR: | About – about how many? |
| WITNESS: | Not – not very many.  I don't know the exact amount but not many. |
| PROSECUTOR: | Well, if we had like 38,363 orders that were filled – okay? |
| WITNESS: | Yeah. |
| PROSECUTOR: | What are we talking about?  How many were declined? |
| WITNESS: | I would say under 100. |

May 15, 2014, GJ Tr. at 56 (with name alterations).

2

Second, Saltzman was compensated for filling prescriptions. The grand jury heard about how this worked:

| | |
|---|---|
| PROSECUTOR: | . . . What has the evidence in this case and investigation shown that motivated Dr. Saltzman to approve all these scripts online with patients he had never met or examined? |
| WITNESS: | Money. |
| PROSECUTOR: | How much money? |
| WITNESS: | Approximately $7 per approval. |
| PROSECUTOR: | Okay. Did Dr. Saltzman get his $7 for denying the application? |
| WITNESS: | No. |
| PROSECUTOR: | He only got $7 if he approved a prescription? |
| WITNESS: | Yes. |

Id. at 55-56 (with name alterations). The grand jury subsequently returned a four-count Indictment against Akinyoyenu and Saltzman in March 2015, charging three conspiracy counts relating to distributing drugs without valid prescriptions and one conspiracy count of mail fraud.

In advance of trial, Akinyoyenu now picks out two instances of prosecutorial misconduct he contends appear in the passages above, which together mandate dismissal of the Indictment. The Court discusses the legal standard before turning to each instance.

## II.     Analysis

When examining a claim that the grand-jury proceeding was infected by prosecutorial misconduct, the Court first affords that proceeding "a presumption of regularity." United States v. Mechanick, 475 U.S. 66, 75 (1986). The Court will only consider dismissing an indictment if the defendant shows that the prosecutor instituted some error or irregularity – more than a mere assertion that the prosecutor presented "inadequate, unreliable or incompetent evidence." United States v. Borda, 905 F. Supp. 2d 201, 204 (D.D.C. 2012); see Fed. R. Crim. P. 12(b)(3)(A)(v)

(allowing dismissal for "error in the grand-jury proceeding").  The defendant must "clearly establish[]" such defect with "particularized proof."  Mechanick, 475 U.S. at 75.

Even if a defendant demonstrates misconduct, the age-old rule of harmless error applies.  See Bank of Nova Scotia v. United States, 487 U.S. 250, 254 (1988); see also Fed. R. Crim. P. 52(a).  That is, the defendant must also prove "'that the violation substantially influenced the grand jury's decision to indict,' or [that] there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  Bank of Nova Scotia, 487 U.S. at 256 (quoting Mechanick, 475 U.S. at 78).  "Dismissal in these circumstances is warranted only when prosecutorial misconduct significantly infringes on the grand jury's ability to render an independent judgment."  United States v. Espy, 23 F. Supp. 2d 1, 9 (D.D.C. 1998).

Akinyoyenu seeks dismissal of the Indictment without prejudice based on two supposed factual errors, which he thinks wrongly portray Saltzman as a rubber stramp.  He first contends that the prosecutor misrepresented "whether and to what extent Dr. Saltzman denied prescription requests submitted to Apexonline."  Mot. at 4.  The Government concedes that the initial, uncertain estimate by its witness – "I don't know the exact amount but not many. . . . I would say under 100" – was too low.  See May 15, 2014, GJ Tr. at 56; see also Opp. at 3.  What follows this concession is a numbers game of how many prescriptions Saltzman actually rejected.  The Government crunches the website data and says 328 prescriptions.  See Opp. at 4-5.  Akinyoyenu retorts that this data has 688 entries for denied prescriptions (though some entries' order numbers are duplicative).  See Reply, Exh. 1 (Prescription-Rejections Spreadsheet).  He also suggests other orders were in effect denied because 36 customers were on a "blacklist."  See Mot. at 7-8.

This numerical discrepancy presents no wide chasm.  The difference between an estimated 100 or some 300 or 600 denials (plus a 36-person blacklist) is inconsequential when

placed next to the roughly 38,000 (or perhaps 57,000) prescriptions approved – the denials are droplets in a bucket of water.  Although the Government's elicited testimony was perhaps incautious, it is difficult to see how this alleged error or confusion could have changed the grand jury's calculus.  The theory underlying the Indictment was not that Saltzman was a careless doctor who happened to overprescribe; it was that, by prescribing drugs based only on short online questionnaires, he practiced medicine absent any doctor–patient relationship whatsoever. See Indictment, Count One, ¶ 20 (describing litany of resulting medical transgressions); see also Espy, 23 F. Supp. 2d at 9-10 (finding, after examining indictment, that it satisfactorily tracked the elements of the crime).  In this context, that Saltzman did the right thing hundreds of times but the wrong thing tens of thousands of times would have been no defense at all.

Akinyoyenu next objects that the Government falsely presented evidence that he "gave Dr. Saltzman a financial incentive to approve prescription requests by compensating him only for issued prescriptions and not for denials."  Mot. at 4; see May 15, 2014, GJ Tr. at 55-56. Akinyoyenu claims that Saltzman's payment letters show instead that the doctor was paid $7 per "consult" (and not approval) and $3.50 per "refill."  Mot., Exh. 4 (July 21, 2010, Letter, enclosing Payment Letters) at 3.  An FBI Report prepared following an interview with Saltzman indicated that he believed "[h]e was paid a rate of $7.00 per prescription . . . whether he issued an approval or a denial of a customer order."  Mot., Exh. 3 (FBI 302 Report).  Akinyoyenu thus argues Saltzman derived no comparative advantage from approving orders.

Defendant's reading of the facts is a generous one, and the documents he cites hardly amount to the "particularized proof" of a defect in the proceedings that is required.  Mechanick, 475 U.S. at 75.  The use of the word "consult" here does not clearly signify payment for both approvals and denials; in fact, it is an obvious misnomer as Saltzman apparently never consulted

with patients. The FBI Report, moreover, describes Saltzman's own uncertainty: "He never questioned the amounts of the paychecks" because he "trusted [Akinyoyenu] and never had a reason to question him." In other places, it also directly contradicts Defendant's position. The Report recounts that if Saltzman wanted his paychecks itemized, Akinyoyenu had agreed to "send the number of <u>approvals</u>," implying that payment was pegged to prescription approvals. <u>See</u> FBI 302 Report (emphasis added).

As with the first issue, the Court does not see how any error as to the compensation scheme could have swayed the grand jury to reach a different outcome. Even assuming Saltzman was paid for <u>every</u> order sent his way, financial incentives to approve still existed. Most obviously, had Saltzman denied scores of prescriptions – painless to do, as he never even saw patients – one would think Akinyoyenu would look elsewhere for doctors. In other words, Saltzman had a motive to adhere to the old adage: What's good for you is good for me. Beyond this, there was yet another built-in incentive – Saltzman naturally could receive the tack-on benefit of <u>refills</u> only if he first issued prescription <u>approvals</u>. The motive, therefore, was there.

This Court, in sum, concludes that neither instance of alleged prosecutorial misconduct "may have had 'substantial influence' on the outcome of the proceeding," <u>Bank of Nova Scotia</u>, 487 U.S. at 256 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 765 (1946)).

### III. Conclusion

For the reasons set forth above, the Court will deny Defendant's Motion in a separate Order to be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: August 3, 2016